## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SIERRA N. CASTLE, | |
| Plaintiff, | |
| v. | |
| COBB COUNTY, GEORGIA; SHERIFF NEIL WARREN, in his Official and Individual Capacities; and COL. JANET PRINCE, as Division Commander of the Cobb County Adult Detention Center; LT. COL. DAVID SANDERS, as Assistant Division Commander of the Cobb County Adult Detention Center; C.O. JOHN DOE; SGT. JANE DOE; MAJ. JOHN DOE #1; and, MAJ. JOHN DOE #2; in their Individual Capacities, | Civil Action No.: _____ |
| Defendants. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Sierra N. Castle, by and through the undersigned counsel, brings this action pursuant to Section 1983 and the Fourteenth Amendment to the United States Constitution, Title II of the Americans With Disabilities Act and the Rehabilitation Act, and Georgia law. Plaintiff alleges that Defendants Cobb County, Georgia, Sheriff Neil Warren, in his Official and Individual Capacities, and Col. Janet Prince, Lt. Col. Davis Sanders, C.O. John Doe, Sgt. Jane Doe, Maj. John

Doe #1, and Major John Doe #2, all in their Individual Capacities, subjected Plaintiff to violations of her constitutional rights, intentional infliction of emotional distress, and discrimination based on disability, as follows:

## JURISDICTION AND VENUE

1.

This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, as well as the Fourteenth Amendment of the United States Constitution, and the Americans With Disabilities Act and the Rehabilitation Act.  This action also arises under the laws of the State of Georgia.

2.

This Court has original jurisdiction over Plaintiff's causes of action arising under the United States Constitution and laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction should be conferred over the remaining causes of action pursuant to 28 U.S.C. § 1367.

3.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all of the events, acts, or omissions giving rise to Plaintiff's claims occurred in Cobb County, Georgia.

## PARTIES

### 4.

Plaintiff Sierra N. Castle (hereinafter, "Plaintiff" or "Castle") is a citizen of the United States and a resident of Georgia.  Ms. Castle was, at all times relevant hereto, a pretrial detainee, or "inmate,"[1] in the custody of the Cobb County Adult Detention Center, located in Marietta, Cobb County, Georgia.

### 5.

Defendant Cobb County, Georgia is a county government organized under the Constitution and laws of the State of Georgia.  Defendant receives Federal financial payment and/or grants of assistance.  Defendant is considered a public entity under the Americans With Disabilities Act.  Moreover, the Cobb County Adult Detention Center is a service, program, or activity provided by Defendant, and of which Defendant is responsible, and the Cobb County Adult Detention Center is considered a public entity under the Americans With Disabilities Act. Defendant may be served with process through a majority of its Commissioners, pursuant to O.C.G.A. § 36-1-5, or through the Chairman of its Board of Commissioners, pursuant to O.C.G.A. § 9-11-4(e)(5).

---

[1] The terms "detainee" and "inmate" are used interchangeably and in their colloquial sense.  These terms should not be taken as a representation regarding the status of a person in custody in terms of whether the custody is governed by the Fourth, Fourteenth, or Eighth Amendments.

6.

Defendant Sheriff Neil Warren was, at all times relevant hereto, the Sheriff of Cobb County, Georgia.  As Sheriff, Defendant manages the Sheriff's Office, which includes the operation of the Cobb County Adult Detention Center.

7.

Defendant Col. Janet Prince was, at all times relevant hereto, the Division Commander of the Cobb County Adult Detention Center.  As Division Commander, said Defendant manages its day-to-day operations and executes its policies.

8.

Defendant Lt. Col. David Sanders was, at all times relevant hereto, the Division Commander of the Cobb County Adult Detention Center.  As Assistant Division Commander, said Defendant assisted in managing its day-to-day operations and executed its policies.

9.

Defendant Sgt. Jane Doe was, at all times relevant hereto, a corrections officer with the rank of Sergeant at the Cobb County Adult Detention Center.  As a Sergeant, said Defendant was responsible for managing and supervising the facility and managing and supervising her subordinate corrections officers.

10.

Defendants Maj. John Doe #1 and Maj. John Doe #2 were, at all times relevant hereto, corrections officers with the rank of Major at the Cobb County Adult Detention Center.  As Majors, said Defendants were responsible for managing the facility and managing and supervising their subordinate corrections officers.

11.

Defendant C.O. John Doe was, at all times relevant hereto, an employee of the Cobb County Sheriff's Office, employed as a corrections officer at the Cobb County Adult Detention Center.

12.

At all times relevant hereto, all Defendants were operating under color of law.

## STATEMENT OF FACTS

### The Arrest

13.

On March 21, 2018, Ms. Castle was frequenting the drive-through at a local fast food restaurant when the wind blew open the door to a garbage receptacle, and the receptacle then collided with Ms. Castle's vehicle causing damage.

14.

Having not received a sufficient response from the management of the restaurant, Ms. Castle contacted the Cobb County Police Department to make an incident report approximately one-week later on March 28, 2018.

15.

Shortly thereafter, a Cobb County Police officer met Ms. Castle in the parking lot of the precinct to take down a report. When the officer ran Ms. Castle's license through the Georgia Crime Information Computer, he found that a bench warrant had been issued by the State Court of Dekalb County on October 12, 2017, due to Ms. Castle's failure to appear for or pay the fine for a citation issued for a seat belt violation.

16.

The fine for this violation was $15.00.

17.

Ms. Castle was immediately arrested and detained by the Cobb County Police officer, and Ms. Castle was transported to the Cobb County Adult Detention Center, also known as the Cobb County Jail Complex, (hereinafter, "CCADC") without incident, arriving at approximately 10:00 pm.

18.

The CCADC is a detention facility that is operated by the Cobb County Sheriff's Office.

Gender Dysphoria & Treatment

19.

At some point during the arrest or their subsequent travel, Ms. Castle informed the officer that she was a transgender female.

20.

Ms. Castle suffers from has been clinically diagnosed with Gender Dysphoria, a rare but serious medical condition and a disability.

21.

Gender dysphoria, as defined by the Fifth Edition of the Diagnostic Manual of Mental Health Disorders (hereinafter, "DSM-5"), is a medical condition in which there is a marked incongruence between one's experienced or expressed gender and one's assigned sex at birth, lasting for at least 6 months and manifested through at least two of the following symptoms:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics;

2. A strong desire to be rid of one's primary and/or secondary sex characteristics;

3.  A strong desire for the primary and/or secondary sex characteristics of the other gender;

4.  A strong desire to be of the other gender;

5.  A strong desire to be treated as the other gender; or,

6.  A strong conviction that one has the typical feelings and reactions of the other gender.

22.

A person with Gender Dysphoria experiences clinical distress from having a gender identity – an internalized sense of being male or female – that is different than this or her assigned sex and gender at birth.

23.

Gender dysphoria is associated with high levels of stigmatization, discrimination, and victimization.  The isolation and discrimination expressed by someone with Gender Dysphoria often leads to negative self-esteem, increased risk of mental disorders, and comorbidity (i.e., suffering from another disease or disorder).

24.

Individuals suffering from Gender Dysphoria often experience severe psychological harm and suffering, including anxiety, depression, and/or thoughts of suicide.

25.

Gender Dysphoria substantially limits several major life activities, including an individual's ability to care for herself, eating, sleeping, learning, concentrating, thinking, communicating with and interacting with others, and reproducing. Moreover, Gender Dysphoria substantially limits the operations of major bodily functions, including neurological function, brain function, reproductive function, and the function of the endocrine system.

26.

However, Gender Dysphoria is highly treatable.

27.

Treatment protocol for Gender Dysphoria, as recommended by the American Psychiatric Association, includes "counseling, cross-sex hormones, gender reassignment surgery, and social and legal transition to the desired gender." Going through a "gender transition" is the medical process of changing one's body from

that typically associated with his or her assigned sex at the time of birth to that typically associated with the person's gender identification.

28.

While Ms. Castle was assigned male at birth, but she understood herself to be female from a very young age.  Subsequently, she saw a doctor who ultimately diagnosed her with Gender Dysphoria.

29.

As a part of her treatment and care, her doctors recommended that she undergo a gender transition.  As a part of that transition, she went through the process of social role transition and medical transition, including hormone therapy.  Since she began her transition, she has identified and presented entirely as female and she is known to everyone by her chosen female name. In 2011, Ms. Castle successfully had her name legally changed, and her birth certificate and all other government-issued identification and records have been amended to reflect the change of her legal name.  In 2012, Ms. Castle has undergone sex reassignment surgery, also known as gender confirmation surgery, consistent completed consistent with World Professional Association for Transgender Health standards and requirements.  In 2015, Ms. Castle successfully had her gender legally changed, and her birth

certificate and all other government-issued identification and records have been amended to reflect the change of her legal gender.

30.

As a result of this gender transition and apart from her mistreatment, as described herein, Ms. Castle is a woman and has been able to live fully and consistently with her female identity prior to her detention in the CCADC.

Detention in the Cobb County Adult Detention Center

31.

Critically, Ms. Castle was identified as female in the Cobb County Police Department Incident/Investigation Report as well as in both the Warrant and subsequent Notice of Withdrawal of Suspension issued by the State Court of DeKalb County.

32.

Prior to changing into the clothing provided to all detainees upon her subsequent intake, Ms. Castle arrived at CCADC wearing a dress, a pair of earrings, and a hair tie.

33.

Upon their arrival to the CCADC, the arresting Cobb County Police Officer informed CCADC staff that Ms. Castle is transgender.

34.

Ms. Castle observed CCADC staff laughing when they were told this information.

35.

Ms. Castle was taken to intake, and she confirmed her information with another female officer, including her correct, legal name and that her gender was female.

36.

Ms. Castle's government-issued identification that she presented during intake indicates that she is female.

37.

Initially, Ms. Castle was provided with an inmate identification wristband that stated her legal name and listed her as "female."

38.

Subsequently, an unknown male CCADC officer (hereinafter, "C.O. John Doe") then conducted a search of Ms. Castle by patting her down using his hands.

39.

Ms. Castle objected and inquired as to whether it was appropriate for a male officer to be patting her down.

40.

C.O. John Doe responded, asking, "Aren't you transgender?"  C.O. John Doe also stated that whomever pats down a detainee depends on that person's genitalia.

41.

C.O. John Doe also told Ms. Castle that she "would be considered male while in jail," and he continued to search Ms. Castle by patting her down.

42.

This pat down occurred in full view of several other CCADC staff.

43.

C.O. John Doe repeatedly referred to Ms. Castle on several occasions as "Mister" and by using male pronouns such as "he."

44.

Once intake was complete, an unknown female CCADC staff member told Ms. Castle to sit in a pink chair on the side of the room in the area designated for female inmates with other female inmates.   However, C.O. John Doe then interrupted the female staff member, stating, "No, *Mister* Castle sits in the blue chairs," and he instructed Ms. Castle to move to the other side of the room and sit in a chair intended for males alongside male inmates. Ms. Castle objected to being required to be seated in the area designated for male inmates.

45.

Ms. Castle was then taken to a holding cell that she later discovered was intended for housing male detainees.

46.

At some point, a member of the CCDAC staff apparently changed the records in its computer system from the information collected at intake to then identify Ms. Castle as being male.

47.

CCDAC staff escorted Ms. Castle back to the intake desk for fingerprinting, and the intake staff attempted to swap Ms. Castle's inmate identification wristband for one that listed her gender as "male" consistent with the aforementioned change of her record.

48.

Ms. Castle refused to trade the identification wristband that listed her as female with the new bracelet that listed her as male.  As a result, one sympathetic female member of the CCADC staff, who apparently overheard this exchange, apologized to Ms. Castle for the treatment of her, although she escorted Ms. Castle back to the male holding cell.

49.

Subsequently, Ms. Castle requested to use a telephone, and CCDAC staff allowed Ms. Castle to exit the holding cell for such purpose.

50.

However, when Ms. Castle attempted to use a telephone on the side of the room designated for female inmates, she was told by one of CCADC's unknown female supervisors (hereinafter, "Sgt. Doe"[2]) that she was to use the phones designated for male inmates.  Sgt. Doe also stated that, while in jail, she would be known as "Mister Castle."

51.

This comment was made within earshot of several male inmates, who heard Sgt. Doe's comments, became riled up and aggressive toward Ms. Castle as a result.

52.

When Ms. Castle refused to use a male telephone, CCDAC staff did not allow her to use the telephone at all and returned her to the male holding cell.

53.

Ms. Castle informed another corrections officer of what had transpired, and the corrections officer offered to move Ms. Castle from the male cell to a nongender-

---

[2] It is unknown to Plaintiff whether this individual held the rank of Sergeant or Lieutenant.

specific cell – although, this cell was still located in close proximity to holding cells designated for male inmates.

54.

Each time that Ms. Castle left her cell, the male inmates nearby made sexually-degrading, harassing, abusive, and threatening comments toward and about Ms. Castle.

55.

Male inmates would also peer into Ms. Castle's cell while walking by and make sexually-degrading, harassing, abusive, and threatening comments toward and about Ms. Castle.

56.

Overnight, Ms. Castle attempted to get the attention of CCADC staff, including by ringing an intercom button, but she was largely ignored.

57.

Ms. Castle has a serious medical condition that requires her to take prescription medication on a daily basis.

58.

When Ms. Castle saw that rounds for prescription medication were being performed, Ms. Castle rang her buzzer to inform the corrections officers that she

needed to take her medication.  Ms. Castle's was largely ignored, and she was ultimately not provided with her medication or any medical treatment whatsoever.

59.

Sgt. Doe arrived at Ms. Castle's holding cell shortly thereafter to get her to stop ringing the buzzer.  Sgt. Doe refused to respond to Ms. Castle's medical requests; rather, in an attempt to humiliate Ms. Castle, Sgt. Doe responded, "didn't you tell the officers you're transgender?" This comment was made in front of several male inmates, who responded audibly with jeers.

60.

Critically, for the type of medications which Ms. Castle has been prescribed, it is extremely dangerous for such an individual to fail to take even a single dose of the medication at the prescribed times.  Ms. Castle asked to speak with a supervisor about her medication, but this request was denied.

61.

The next day, March 29, 2018, Ms. Castle was one of the inmates set to be transferred to a detention facility in Dekalb County.  In preparation for the transfer, inmates were handcuffed together based on their gender; however, Ms. Castle was segregated from all the other inmates and taken to a different area of the jail.

62.

Before Ms. Castle was placed in a different holding cell, she stopped at the security desk, advised two male CCADC supervisors (hereinafter, "Maj. John Doe # 1" and "Maj. John Doe # 2") of what she had experienced and asked them to correct her gender in CCADC records.  Maj. John Doe #1 laughed at Ms. Castle and told her that if she wanted to change her gender, she should do it like she did before and get an order from a court.  Maj. John Doe #2 responded that he was not going to get involved.

63.

After Ms. Castle was transferred to the other holding cell, male detainees would peer into her cell and make sexually-degrading and threatening comments directed at Ms. Castle.  Specifically, she was told by several of the detainees to "flash" the male detainees (i.e., lift her shirt to expose her breasts).

64.

Ms. Castle was extremely distressed and disturbed by these comments and she felt that her personal safety and security had been jeopardized.

65.

Ms. Castle rang the buzzer in an attempt to get the attention and assistance of CCDAC staff. However, her attempts to get the attention of CCDAC staff were

ignored, and she was told over the intercom to stop ringing the buzzer unless there is an emergency.

66.

The aforementioned sympathetic CCADC staff member ultimately placed a temporary barrier in front of Ms. Castle's cell; however, this barrier completely isolated Ms. Castle and prevented her from being able to see anything other than the inside of the holding cell for a number of hours.

67.

Ms. Castle subsequently learned that her $15.00 seat belt fine had been paid and a Notice of Withdrawal of Suspension had been issued by the State Court of Dekalb County.  When Ms. Castle rang the buzzer to inquire as to when she would be released, CCADC staff told her that she would sit in the cell as long as she was "misbehaving."

68.

Subsequently, a deputy from the DeKalb County Sheriff's Office arrived to transfer detainees to its facility at approximately 1:00 pm.

69.

Ms. Castle overheard the DeKalb County deputy inform CCDAC staff that he could not transport Ms. Castle because the CCADC transfer request paperwork indicated that the transfer was for a male inmate, which Ms. Castle was not.

70.

At some point thereafter, Ms. Castle told the deputy and CCADC staff that she believed that the citation had been paid earlier that day.  The deputy confirmed the accuracy of this information when he checked the appropriate records.

71.

Ms. Castle was subsequently released from CCADC.  However, although her release had been ordered at approximately 10:00 am, she was not actually released from the CCADC facility until approximately 4:00 pm that day.

72.

After her release, Ms. Castle attempted to contact Defendant Prince, but Ms. Castle did not receive a response from her.

73.

Ms. Castle also attempted to contact Defendant Sanders, who she ultimately communicated with by telephone and by email.

74.

Defendant Sanders said that Sgt. Doe had advised him that Ms. Castle told CCADC staff that she had male genitalia.  However, Ms. Castle never made such a statement and this information is not accurate.

75.

Defendant Sanders requested that Ms. Castle send an email with copies of her identification, court orders, and a letter from her doctor, all showing that she is female.

76.

After a person is detained at CCADC, their name and information remain listed on the Sheriff's Office web site for a certain period of time.

77.

However, immediately after Ms. Castle complained about her treatment at CCADC to Defendant Sanders, her name and information, which listed her as male, was removed early and before she was able to preserve this as documentation.

78.

The Sheriff's Office has adopted guidelines and zero tolerance policies, pursuant to the Federal Prison Rape Elimination Act, with respect to certain individuals, including those who are transgender.

79.

According to Sheriff's Office policies, CCADC staff are not permitted to pat-down a detainee of another gender, staff should give serious consideration to transgender individuals' own views of their safety with respect to housing assignments, and staff should receive training on how to professionally communicate with transgender individuals.

80.

Defendants demonstrated a clear, deliberate indifference to the safety of Ms. Castle.

81.

Several Defendants, themselves, subjected Ms. Castle to offensive and sexually harassing, abusive, and threatening remarks and refused to refer to her by the appropriate gender.

82.

Defendants failed to properly and correctly assess Ms. Castle's gender, resulting in her being detained in areas meant for male detainees, where she was subjected to sexually abusive comments from detainees, and she feared for her safety.

83.

Defendants failed to properly search and/or "pat-down" Ms. Castle.

84.

Defendants failed to properly house Ms. Castle.

85.

Defendants failed to provide Ms. Castle with critical medical care and prescription medication that she requires for a serious medical condition.

86.

Ms. Castle suffered damages as a result of the acts and omissions by Defendants, individually and jointly, and by Defendants not receiving the appropriate and proper training.

87.

Defendants failed to follow their own policies when a detainee, like Ms. Castle, is in their custody and is also sexually harassed by other detainees and staff.

88.

As a result of Defendants' acts and omissions, Ms. Castle has experienced, and continues to experience, constant fear for her health and safety, sadness, anxiety, and emotional distress due to the trauma that she experienced while in Defendants' custody.

89.

On or about September 7, 2018, Ms. Castle notified Sheriff Neil Warren and the Cobb County Board of Commissioners in correspondence sent via United States Postal Service Certified Mail of her claims and requested that all records and evidence related to her claims be preserved.  To date, Ms. Castle has not received any response to this notice.

## COUNT I:
## DELIBERATE INDIFFERENCE TO SUBSTANTIAL RISK OF HARM TO HEALTH AND SAFETY IN VIOLATION OF THE FOURTEENTH AMENDMENT
## (Defendants C.O. Doe, Sgt. Doe, Maj. John Doe #1 & Maj. John Doe #2)

90.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 89, as if the same were set forth herein.

91.

Count I is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution of the United States.  Specifically,

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

42 U.S.C. § 1983.

92.

As a pretrial detainee, Plaintiff's rights "exist under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009).   However, "the standards under the Fourteenth Amendment are identical to those under the Eighth." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

93.

Accordingly, the Fourteenth Amendment "imposes [a] dut[y] on [prison] officials" to "take reasonable measure to guarantee the safety of the inmates." *See Farmer v. Brannan*, 511 U.S. 825, 832 (1994) (discussing the Eighth Amendment) (internal quotations omitted).   In particular, under the Fourteenth Amendment, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Id.* at 833.

94.

A prison official violates the Fourteenth Amendment "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016) (internal quotations omitted).   To state a

Fourteenth Amendment claim of deliberate indifference, a plaintiff must allege facts sufficient to show 1) that she was subjected to "substantial risk of serious harm;" 2) the defendant's deliberate indifference to that risk; and, 3) causation. *Purcell ex rel. Estate of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1319 (11th Cir. 2005) (discussing the Eighth Amendment).

95.

Moreover, an inmate "need not wait for a tragic event to occur before seeking relief, she must at the very least show that a condition of her confinement posed an unreasonable risk of serious damage to her future health or safety." *Pichardo de Veloz v. Miami-Dade County*, No. 17-13059 (11th Cir. Nov. 21, 2018) (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004)) (internal quotations omitted).

96.

Designating a female detainee as male and assigning said detainee to male facilities creates an extreme condition and poses an unreasonable risk of serious harm to the female detainee's future health and safety.  Such an action poses an objectively outrageous risk that the detainee will be harassed, assaulted, raped, or worse.

97.

Designating a transgender female detainee as male and assigning said detainee to male facilities creates an extreme condition and poses an unreasonable risk of serious harm to the transgender female detainee's future health and safety. Such an action poses an objectively outrageous risk that the detainee will be harassed, assaulted, raped, or worse.

98.

On March 28 through March 29, 2018, Defendants C.O. John Doe, Sgt. Jane Doe, Maj. John Doe #1, and Maj. John Doe #2 were acting under color of state law in their capacity as correctional officers at the Cobb County Adult Detention Center and the acts and omissions described herein were conducted within the scope of their official duties or employment when they designated Plaintiff, a transgender female, as male and assigned her to male facilities.

99.

At all times material and relevant, said Defendants owed Plaintiff a duty to provide safe conditions of confinement.

100.

Said Defendants also had a duty to stop other corrections officers, including their coworkers and subordinate officers, from placing Plaintiff in unnecessarily dangerous conditions of confinement.

101.

Said Defendants breached that duty when they failed to provide Plaintiff with safe conditions of confinement and failed to prevent other corrections officers, including their coworkers and subordinate officers, from placing Plaintiff in unnecessarily dangerous conditions of confinement.

102.

Plaintiff's appearance and attire was consistent with the characteristics traditionally understood to be female and/or feminine.  Plaintiff informed said Defendants that she was female during intake and on numerous other occasions, and she was initially considered female during intake.  All of the information contained in Plaintiff's government-issued identification indicated that she was female.  Both the arresting officer and the Warrant for Plaintiff's arrest identified her as female.  Plaintiff had been subjected to a thorough physical search of her person by C.O. John Doe, including a pat-down, that revealed that she was indeed female.

103.

Accordingly, said Defendants had actual, subjective knowledge that Plaintiff was female.

104.

Both the arresting officer and Plaintiff informed Defendants that she identified as a transgender female.

105.

Defendants had actual, subjective knowledge that Plaintiff was a transgender female.

106.

Nonetheless, said Defendants caused Plaintiff to be considered and classified as male, subjected her to a search by a male corrections officer, assigned her to male facilities, and confined her with male inmates.   In so doing, said Defendants knowingly disregarded the risk associated with wrongfully classifying Plaintiff as male.

107.

Said Defendants failed to act, intervene, or take any action when they observed that their fellow corrections officers, including their subordinate corrections officers, had classified Plaintiff as male, subjected her to a search by a

male corrections officer, assigned her to male facilities, and confined her with male inmates.  In so doing, Defendants knowingly disregarded the risk associated with failing to act, intervene, or take any action when they observed other Defendants classify Plaintiff as male.

108.

The actions of said Defendants amounted to a reckless disregard of the known rights of Plaintiff and therefore violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

109.

As a proximate case of the unconstitutional policies, practices, and acts of said Defendants, Plaintiff suffered sexual harassment, irreparable injury, including severe and long-lasting emotional distress, humiliation, anxiety, and psychological injury resulting in past and future mental anguish, past and future pain and suffering, aggravation of preexisting injury, future medical expenses, and other compensatory damages in an amount to be proven at trial.

110.

Plaintiff will experience economic losses consisting of future health care expenses because, during the course of her detention, her medical conditions were aggravated.

111.

At the time of this incident in 2018, every reasonable jail and prison officer would have known that wrongfully misclassifying and placing a female detainee in male population of a detention facility was unlawful. The conduct at issue here lies so obviously at the very core of what the Eighth and Fourteenth Amendments prohibit that the unlawfulness of placing a female detainee within the male population and refusing to refer to a female detainee as female was readily apparent to any prison officer in the shoes of Defendants. Accordingly, Defendants violated Plaintiff's clearly-established rights, and they are not entitled to qualified immunity.

112.

At the time of this incident in 2018, every reasonable jail and prison officer would have known that wrongfully misclassifying and placing a transgender female detainee in male population of a detention facility was unlawful. The conduct at issue here lies so obviously at the very core of what the Eighth and Fourteenth Amendments prohibit that the unlawfulness of placing a transgender female detainee within the male population and refusing to refer to a female detainee as female was readily apparent to any prison officer in the shoes of Defendants. Accordingly, Defendants violated Plaintiff's clearly-established rights and they are not entitled to qualified immunity.

113.

Plaintiff is entitled to recover damages including, but not limited to, past and continuing medical expenses for her physical and emotional pain, shock, agony, suffering, loss of earnings and wages, as well as attorney's fees and costs of litigation, in an amount to be proven at trial.

## COUNT II:
## SUPERVISOR LIABILITY
## IN VIOLATION OF THE FOURTEENTH AMENDMENT
## (Defendants Sgt. Doe, Maj. John Doe #1 & Maj. John Doe #2)

114.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 89, as if the same were set forth herein.

115.

Count II is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution of the United States.  Specifically,

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

42 U.S.C. § 1983.

116.

It is well established that supervisory officials may be liable under Section 1983 for the actions of their subordinates "when the supervisor personally participated in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional depravation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).

117.

As alleged in Count I, Defendants Sgt. Doe, Maj. Doe #1, and Maj. Doe #2 were direct participants in, or observed and failed to prevent, the deprivation of Plaintiff's constitutional rights.

118.

There is also a causal connection between the actions of Defendants Sgt. Doe, Maj. Doe #1, and Maj. Doe #2 and the deprivation of Plaintiff's constitutional rights for several reasons.  Defendants were put on notice of the need to have corrected the alleged deprivation because they were aware that inmates who identify as transgender are especially susceptible to harassment, abuse, and violence while in custody, which is evidenced, in part, by the Cobb County Sheriff's Offices policies

under the Prison Rape Elimination Act.  Moreover, the facts support an inference that said Defendants directed their subordinates to act unlawfully and knew that subordinates were acting unlawfully and failed to stop them from doing so.

119.

A prison official violates the Eighth Amendment "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016) (internal quotations omitted).  To state an Eighth Amendment claim of deliberate indifference, a plaintiff must allege facts sufficient to show 1) that she was subjected to "substantial risk of serious harm;" 2) the defendant's deliberate indifference to that risk; and, 3) causation. *Purcell ex rel. Estate of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1319 (11th Cir. 2005).

120.

Plaintiff was injured as a result of the depravation of her constitutional rights, as alleged in Count 1, and Defendants Sgt. Doe, Maj. Doe #1, and Maj. Doe #2 should be held liable for such damages in their supervisory capacity, including an award of reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

## COUNT III:
## FAILURE TO HIRE, TRAIN, AND SUPERVISE STAFF
## IN VIOLATION OF THE FOURTEENTH AMENDMENT
## (Defendants Sheriff Warren in his Individual Capacity, Col. Prince, and Lt. Col. Sanders)

### 121.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 89, as if the same were set forth herein.

### 122.

At all relevant times, Defendants Sheriff Warren, Col. Prince, and Lt. Col. Sanders were acting under color of state law in their respective capacities as Sheriff, Division Commander of the Cobb County Adult Detention Center, and Assistant Commander of the Cobb County Adult Detention Center and the acts and omissions described herein were conducted within the scope of their official duties.

### 123.

Defendants Sheriff Warren, Col. Prince, and Lt. Col. Sanders are the final policy- and decision-makers for the Cobb County Adult Detention Center and they are ultimately responsible for the hiring, training, and discipline of the staff of the Cobb County Adult Detention Center.

Moreover, Defendant Sheriff Warren is the final policy- and decision-maker for the Cobb County Sheriff's Office and he is ultimately responsible for the hiring, training, and discipline of the employees of the Cobb County Sheriff's Office.

124.

Defendants failed to properly train their staff concerning the assignment, housing, and treatment of transgender detainees, despite knowing of the increased risk that transgender inmates may be sexually abused, sexually assaulted, or sexually harassed by other inmates and staff, which was likely to continue absent training.

125.

Defendants' knowledge is evidenced, in part by the Cobb County Sheriff's Office's adoption of policies consistent with the Prison Rape Elimination Act, which was intended to address the detection, prevention, and response to all incidents of inappropriate sexual behavior within the Cobb County Adult Detention Center.

126.

Defendants knew that, based on their failure to train or acquire competent corrections officers, transgender inmates would be especially susceptible to becoming victims and/or targets of sexual abuse, sexual assault, sexual misconduct, sexual harassment, and other forms of inappropriate sexual behavior.

127.

As a direct and foreseeable consequence of Defendants' conscious disregard of the obvious need to train personnel, Plaintiff has been injured in violation of the Fourteenth Amendment and fundamental notions of decency.

128.

Plaintiff has suffered and continues to suffer irreparable physical injury and emotional harm as a result of Defendants' failure to hire, train, and supervise personnel, and will continue to suffer substantial and irreparable harm absent immediate relief.

129.

Plaintiff was injured as a result of the failure of Defendants Sheriff Warren, Col. Prince, and Lt. Col. Sanders to hire, train, and supervise staff appropriately, and Plaintiff is entitled to recover all damages available to her, including an award of reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

## COUNT IV:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Defendants C.O. John Doe)

130.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 89, as if the same were set forth herein.

131.

In Georgia, a plaintiff may recover for the tort of intentional infliction of emotional distress by showing: 1) that a defendant's conduct was intentional or reckless; 2) the conduct was extreme and outrageous; 3) there is a causal connection between the wrongful conduct and the emotional distress; and, 4) the emotional distress must be severe.  *Clark v. Arras*, 212 Ga. App. 695, 696 (1994).

132.

As alleged, Defendant C.O. Doe intentionally came into contact with the person of Plaintiff, including Plaintiff's genital area, in order to conduct an invasive search known as a "pat down," which was in violation of the policies and procedures of the Cobb County Sheriff's Office.  Further, C.O. Doe knew that Plaintiff was female, but he intentionally referred to Plaintiff as "Mister" and used male pronouns on several occasions, and loudly and publicly forced her to sit in chairs designated for male inmates.

133.

Defendant C.O. Doe had no legitimate basis for the aforementioned actions and conduct.

134.

Defendant C.O. Doe's conduct, especially when taken together, is of such serious import as to give rise to such intense feelings of humiliation, embarrassment, fright, and extreme outrage to cause any female inmate severe emotional distress.

135.

Moreover, C.O. Doe's conduct would have been even more likely to cause any transgender female inmate severe emotional distress.

136.

As alleged, Defendant C.O. Doe's actions caused Ms. Castle to experience intense feelings of humiliation, embarrassment, concern and fright for her physical health and safety, and extreme outrage, which all caused Plaintiff to experience, and continue to experience, severe emotional distress.

137.

Plaintiff has been injured by the actions of Defendant C.O. Doe and Plaintiff is entitled to damages, including an award of reasonable attorney's fees and costs of litigation, in amount to be proven at trial.

**COUNT V:**
**DISCRIMINATION BASED ON DISABILITY**
**IN VIOLATION OF THE AMERICANS WITH DISABILITY ACT &**
**REHABILITATION ACT**
**(Defendants Cobb County and Sheriff Warren in his Official Capacity)**

138.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 89, as if the same were set forth herein.

139.

Under Georgia law, Defendant Sheriff Warren is the jailer of Cobb County and has custody of the jail and the persons confined therein, subject to the supervision of the governing authority of Defendant Cobb County. Accordingly, Defendants Cobb County and Sheriff Warren share joint responsibility of the Cobb County Adult Detention Facility.

140.

According to Title II of the Americans With Disabilities Act, "… no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

141.

Defendants Cobb County and Sheriff Warren, as well as their Cobb County Adult Detention Center, are considered public entities under Title II of the Americans With Disabilities Act. 42 U.S.C. § 12131.

142.

As recipients of federal funds, Defendants Cobb County and Sheriff Warren are required by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, to make reasonable accommodations to persons with disabilities in their facilities, program activities, and who receive their services.  Such recipients are further required to modify such facilities, services, and programs as necessary to accomplish this purpose.  Accordingly, said Defendants are subject to the mandate of Section 504 of the Rehabilitation Act.

143.

As alleged herein, Plaintiff is properly considered a person with a disability as she has Gender Dysphoria, an impairment that substantially limits several major life activities and that results in a substantial impediment to employment.

144.

While the Americans With Disabilities Act excludes "gender identity disorders" as a condition that is considered a disability, 1) a diagnosis of Gender

Dysphoria involves far more than a person's gender identification; 2) even if this statutory exclusion includes Gender Dysphoria, Plaintiff's condition *does* result from physical impairments, including hormonal and genetic drivers contributing to an in uterio development of dysphoria; and, 3) if this inclusion applies categorically to all diagnosis of Gender Dysphoria, that would violate the Fourteenth Amendment because the legislative history of the exclusion demonstrates that it was driven by animus toward transgender persons.

145.

Defendants subjected Plaintiff to discrimination on the basis of her disability for several reasons, including, but not limited to:

a)      categorizing Plaintiff as male, assigning Plaintiff to male facilities, and identifying Plaintiff's records within Defendants' records as male, despite how she is identified on her state-issued identification;

b)      refusing to train its staff on how to appropriately accommodate, treat, and communicate with individuals with Gender Dysphoria;

c)      blatantly refusing to refer to Plaintiff with female pronouns;

d)      purposefully referring to Plaintiff as male in front of male inmates, thereby creating a substantial risk to Plaintiff's future health and safety; and,

e)      allowing male correctional officers to perform invasive pat-downs of her person, knowing that Plaintiff is a woman, has a female gender identity, has undergone a gender transition, has female genitalia, identifies and lives as a woman, is identified in government records as female, and, like other female inmates, feels fearful and sexually-violated when touched and searched by male correctional officers.

146.

Title II of the Americans With Disabilities Act creates a private cause of action against said Defendants and Defendants are not entitled to sovereign immunity. *United States v. Georgia*, 546 U.S. 151, 158-89 (2006).

147.

As alleged herein, Defendants failed and refused to provide Plaintiff with a reasonable accommodation.

148.

As alleged herein, Defendants' actions amount to intentional discrimination of Plaintiff, as a direct result of her gender dysphoria, in violation of Title II of the Americans With Disabilities Act and the Rehabilitation Act.

149.

Plaintiff has been injured, including emotional injuries, by Defendants' discrimination due to her disability, and Plaintiff is entitled to all damages allowed under the Americans With Disabilities Act and the Rehabilitation Act, up to and including, compensatory damages and attorney's fees and costs of litigation, in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sierra N. Castle respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendants, and Defendants be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff on Count I and against Defendants C.O. John Doe, Sgt. Jane Doe, Maj. John Doe #1, and Maj. John Doe #2, in their Individual Capacities, for all damages allowable under 42 U.S.C. § 1983, including an award of reasonable attorney's fees and costs of litigation, in an amount to be proven at trial;

4)      That judgment be awarded for and in favor of Plaintiff on Count II and against Defendants Sgt. Jane Doe, Maj. John Doe #1, and Maj. John Doe #2, in their Individual Capacities, for all damages allowable under 42 U.S.C. § 1983, including an award of reasonable attorney's fees and costs of litigation, in an amount to be proven at trial;

5)      That judgment be awarded for and in favor of Plaintiff on Count III and against Defendants Sheriff Neil Warren, Col. Janet Prince, and Lt. Col. David Sanders, in their Individual Capacities, for all damages allowable under 42 U.S.C. § 1983, including an award of reasonable attorney's fees and costs of litigation, in an amount to be proven at trial;

6)      That judgment be awarded for and in favor of Plaintiff on Count IV and against Defendant C.O. John Doe, in his Individual Capacity, for all damages allowable under Georgia law, including an award of reasonable attorney's fees and costs of litigation, in an amount to be proven at trial;

7)      That judgment be awarded for and in favor of Plaintiff on Count V and against Defendants Cobb County, Georgia and Sheriff Neil Warren, in his Official Capacity, for all damages allowable Title II of the Americans with Disabilities Act and the Rehabilitation Act, including an award of reasonable attorney's fees and costs of litigation, in an amount to be proven at trial; and,

8)    For such other relief as this Court shall seem just and proper.

Respectfully submitted, this 28th day of March, 2019.


KENNETH E. BARTON III
Georgia Bar No. 301171
M. DEVLIN COOPER
Georgia Bar No. 142447
BRUCE D. DUBBERLY IV
Georgia Bar No. 809675
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
mdc@cooperbarton.com
bdd@cooperbarton.com